No. 21-16059

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

TAIRAY TAQWAIN MORRIS

*Plaintiff-Appellant,*

v.

CALIFORNIA, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 19-cv-02620-HSG
Hon. Yvonne Gonzalez Rogers

**APPELLANT'S OPENING BRIEF**

Samuel Weiss
Rights Behind Bars
416 Florida Avenue NW, Unit 26152
Washington, DC 20001
202-455-4399
sam@rightsbehindbars.org

*Attorney for Plaintiff-Appellant Tairay
Taqwain Morris*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………………………………ii

INTRODUCTION……………………………………………………………………….1

JURISDICTIONAL STATEMENT……………………………………………………..1

ISSUES PRESENTED………………………………………………………………...2

STATEMENT OF THE CASE………………………………………………………….2

SUMMARY OF THE ARGUMENT……………………………………………………8

STANDARD OF REVIEW……………………………………………………………10

ARGUMENT………………………………………………………………………...10

    I.      A WHEELCHAIR AND HOUSING WITH A WHEELCHAIR
             RAMP ARE DISABILITY ACCOMMODATIONS, NOT
             MEDICAL TREATMENT……………………………………………..10

    II.    MORRIS ALSO ALLEGED THE OTHER ELEMENTS OF AN
             ADA CLAIM……………………………………………………...16

            a.  Definition of a disability……………………………………………16

            b.  Programs, services, and activities………………………………...20

            c.  Deliberate indifference……………………………………………23

CONCLUSION………………………………………………………………...25

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010) ............................. 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 10

*Barker v. Osemwingie*, No. 2:16-CV-3008, 2017 WL 3454443 (E.D. Cal. Aug. 11, 2017) ................................................................................................................ 15

*Barker v. Osemwingie*, No. 20-15503, 2021 WL 5564625 (9th Cir. Nov. 29, 2021) ......................................................................................................................... 15

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020)................................................ 14

*Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996)................................................. 11

*Dare v. California*, 191 F.3d 1167 (9th Cir. 1999) ............................................. 16

*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) .................................. 23

*Furgess v. Pennsylvania Dep't of Corr.*, 933 F.3d 285 (3d Cir. 2019) ................. 15

*Golden v. Illinois Dep't of Corr.*, 2016 WL 5373056 (N.D. Ill. 2016).................. 21

*Hebbe v. Pliler*, 627 F.3d 338 (9th Cir. 2010) .................................................... 10

*Kearney v. New York State Dep't of Corr.*, 2012 WL 5197678 (W.D.N.Y. 2012) 21

*Magwood v. Patterson*, 561 U.S. 320 (2010)...................................................... 14

*Matthews v. Pennsylvania Dep't of Corr.*, 613 Fed. App'x 163 (3d Cir. 2015) .... 21

*Munoz v. California Dep't of Corr. & Rehab.*, 842 F. App'x 59 (9th Cir. 2021) .. 14

*Neal v. Indiana Dep't of Corr.*, 2016 WL 6581005 (S.D. Ind. 2016).................... 21

*Palm v. L.A. Dep't of Water & Power*, 886 F.3d 1081 (9th Cir. 2018) ................. 10

*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) ......................... 13, 16

*Pierce v. Orange Cnty.*, 526 F.3d 1190 (9th Cir. 2008)....................................... 16

*Simmons v. Navajo County*, 609 F.3d 1011 (9th Cir. 2010)................................. 12

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)......................................... 17

*Toyota Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) ............. 17

*United States v. Georgia*, 546 U.S. 151 (2006) ....................................................... 13

*Updike v. Multnomah Cnty.*, 870 F.3d 939 (9th Cir. 2017) ............................. 23, 25

*Weilburg v. Shapiro*, 488 F.3d 1202 (9th Cir. 2007) .................................................. 22

*Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067 (2018) .......................... 14

*Wright v. New York State Dep't of Corr.*, 831 F.3d 64 (2d Cir. 2016) ................... 21

**Statutes**

28 U.S.C. § 1291 ............................................................................................................. 2

28 U.S.C. § 1331 ............................................................................................................. 1

29 U.S.C. § 794(b)(1)(A) ............................................................................................. 11

42 U.S.C. § 12101 .......................................................................................................... 1

42 U.S.C. § 12102(1). ................................................................................................... 17

42 U.S.C. § 12102(4)(A). ............................................................................................. 18

42 U.S.C. § 12201(a) ................................................................................................... 11

Pub. L. No. 110-325, 122 Stat. 3553 (2008) ...................................................... 17, 18

**Other Authorities**

28 C.F.R. § 35.108 ....................................................................................................... 18

28 C.F.R. § 35.108(c)(2) .............................................................................................. 18

28 C.F.R. § 35.108(d) ................................................................................................... 18

28 C.F.R. § 35.108(i) ...................................................................................................... 9

28 C.F.R. Pt. 35 App. A ............................................................................................... 11

28 C.F.R. Pt. 35, App. B (Section 35.102 Application) ........................................... 11

Fed. R. App. P. 4(a)(1)(A) ............................................................................................ 2

# INTRODUCTION

Tairay Morris brought a textbook claim for failure to accommodate his disabilities in prison. He alleges limitations in walking and standing that lasted years and were well-documented. He requested, *inter alia*, a wheelchair and access to a wheelchair ramp. He alleges that Defendants, despite their knowledge of his need for such accommodations, failed to provide them.

The district court dismissed his claim by holding that his requests for a wheelchair and access to a wheelchair ramp fell outside of the ADA because they were not requests for disability accommodation but instead for medical treatment. The district court erred. Morris's requests were for archetypical disability accommodations. This Court should reverse and remand for Morris's disability claims to proceed to discovery.

# JURISDICTIONAL STATEMENT

Tairay Taqwain Morris brought claims under the Americans with Disabilities Act, 42 U.S.C. § 12101, and the Eighth Amendment of the United States Constitution. The district court had jurisdiction under 28 U.S.C. § 1331. On April 30, 2020, the district court dismissed with prejudice the ADA claim as well as the Eighth Amendment claim against all but two Defendants. ER-8. The district court granted summary judgment to the remaining Defendants on May 26, 2021. ER-16.

Morris filed a timely notice of appeal on June 21, 2021. ER-43; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## ISSUES PRESENTED

I.   Whether the district court erred in concluding that providing a prisoner who cannot walk a wheelchair and a wheelchair ramp are not disability accommodations but instead medical treatments and therefore outside the scope of the ADA.

II.  Whether Morris plausibly alleged the other elements of a claim for disability discrimination.

## STATEMENT OF THE CASE

### I.   Factual History

Tairay Taqwain Morris, a 44-year-old prisoner at Pelican Bay State Prison, has severe foot and knee problems. His problems began with a foot infection in January 2015. ER-19. By June, the infection had spread through the "spaces between his 4th and 5th toes in his left foot," appearing as "wet macerated" fissures that caused Morris "severe pain." ER-19. Nurse Susan Waddell evaluated Morris's foot that June and advised him to "keep his toes dry," keep his "left foot elevated," and "use cool compresses on top of his foot for discomfort." ER-19. Dr. Sue Risenhoover examined Morris about one week later and diagnosed him with an orthopedic

disorder. ER-20. Morris told her that he "experienced pain every time he put on his shoes or attempted to walk." ER-20.[1]

That fall, Morris began experiencing another problem: swelling in his right knee. He told Dr. Risenhoover about this problem at a follow-up appointment in October 2015, and made "several request[s]" for treatment to her afterwards. ER-20; ER-21. The infection in his foot meanwhile began to appear as a gangrene fungus. ER-21.

In February 2017, Pelican Bay physician Dr. Nancy Adams examined Morris's knee, advising him to keep it "elevated and to submit another sick call request form in two months." ER-21. Over those next two months, Morris repeatedly reported to staff that his condition was growing worse, not better. ER-22. When Dr. Adams finally did see Morris again, in May 2017, he told her that he was experiencing "ongoing" knee pain, and that his knee become "so badly degraded" that "it was preventing him from walking." ER-22. He also showed her the persistent infection on his foot. ER-22. Dr. Adams diagnosed Morris's foot infection as tinea pedis.[2] ER-22. And she diagnosed his knee, based on x-ray results, with "a small effusion, moderate patellofemoral [pain syndrome,] and medical compartment

---

[1] Morris used underlining throughout his *pro se* complaint for emphasis, which this brief does not alter.

[2] Tinea pedis is a contagious fungal skin infection also known as athlete's foot. https://www.mayoclinic.org/diseases-conditions/athletes-foot/symptoms-causes/syc-20353841.

osteoarthritis."[3] ER-22. The osteoarthritis "prevented [Morris] from walking." ER-23.

Despite these diagnoses, Morris received no accommodations or treatment for his knee or foot problems for the next year and a half. ER-23. During that time, his knee and foot conditions deteriorated. Morris told Dr. Adams at their next appointment, in November 2018, that he experienced "chronic knee pains," and that the ulcers on his foot had become "5mm deep at one point." ER-23. Dr. Adams ordered that Morris's foot problems be treated with "general surgery." ER-23.

Evaluations and diagnostics in December 2018 revealed the extent of Morris's knee and foot problems. An x-ray and MRI of his knee showed that Morris still had "arthritis with joint effusion," and that his osteoarthritis and pateuofemoral pain had become "severe." ER-24; ER-25. The MRI also detected an "extensive tear of the posterior horn and body of the medial meniscus" ("officially diagnosed" as a "right

---

[3] An effusion is an "abnormal collection of fluid" in the body. https://www.cancer.gov/publications/dictionaries/cancer-terms/def/effusion. Patellofemoral pain syndrome is a "pain at the front of your knee" that "often increases when you run, walk up or down stairs, sit for long periods, or squat." https://www.mayoclinic.org/diseases-conditions/patellofemoral-pain-syndrome/symptoms-causes/syc-20350792#:~:text=Patellofemoral%20(puh%2Dtel%2Do,that%20involve%20runni ng%20and%20jumping. Medical compartment osteoarthritis is an arthritis of the knee that is most commonly treated by a "total knee replacement." https://online.boneandjoint.org.uk/doi/full/10.1302/2058-5241.6.200102.

knee meniscal tear"[4]) and an injury to his "anterior cruciate ligament," or ACL.[5] ER-25. Morris's foot infection had also worsened. At a December 2018 surgical consultation at Grants Pass Hospital, Dr. Mark F. Deatherage evaluated Morris and concluded that "amputation may be required." ER-24. Diagnostics of Morris's foot showed "soft tissue edema and enhancement  with cellulitis present adjacent to the 4th and 5th metatarsophalangeal joints, and moderate to severe degenerative changes at the talonavicular joints."[6] ER-24.

---

[4] A meniscal tear is an injury to the cartilage in the knee that can cause "pain, swelling, and stiffness," "inability to move your knee normally," and increased chances of "develop[ing] osteoarthritis in the injured knee." https://www.mayoclinic.org/diseases-conditions/torn-meniscus/symptoms-causes/syc-20354818#:~:text=The%20meniscus%20is%20a%20C,the%20most%20common%20knee%20injuries.

[5] The ACL is "one of the strong bands of tissue that help connect your thigh bone … to your shinbone"; an injury to the ACL usually causes "severe pain," "inability to continue activity," "rapid swelling," "loss of range of motion," and "a feeling of instability or 'giving way' with weight bearing." https://www.mayoclinic.org/diseases-conditions/acl-injury/symptoms-causes/syc-20350738#:~:text=The%20anterior%20cruciate%20ligament%20(ACL,%2C%20soccer%2C%20tennis%20and%20volleyball.

[6] Edema is a "swelling caused by excess fluid trapped in your body's tissues." https://www.mayoclinic.org/diseases-conditions/edema/symptoms-causes/syc-20366493#:~:text=This%20swelling%20(edema)%20is%20the,in%20your%20legs%20or%20arms. Cellulitis is a "bacterial skin infection that causes redness, swelling, and pain" that, "[i]f untreated … can spread and cause serious health problems." https://www.cdc.gov/groupastrep/diseases-public/Cellulitis.html#:~:text=Cellulitis%20is%20a%20common%20bacterial,Many%20Bacteria%20Can%20Cause%20Cellulitis. And a degenerated talonavicular joint compromises "the side to side motion of the foot" that is required to walk. https://www.foot-ankle-surgeon.co.uk/talonavicular-arthritis/.

Morris requested and received a knee brace and cane in December 2018, which he needed "because he could barely walk." ER-23. He received those accommodations "eighteen (18) months after being diagnosed with knee osteoarthritis and three (3) years after being diagnosed with an orthopedic disorder." ER-23.

Throughout Morris's more than three-year history of knee and foot problems, he requested reasonable accommodations that the prison either provided belatedly or failed to provide at all. In addition to the knee brace and cane that Morris received in December 2018, Morris also requested a wheelchair and "to be moved to a building with a wheelchair ramp." ER-28; ER-35; ER-36; ER-37; ER-38; ER-40. He never received a wheelchair, and his request to be moved to a building with a ramp was denied. ER-28; ER-35; ER-36; ER-37; ER-38; ER-40. Morris also requested "to be transferred to a prison where he can have constant access to an orthopedist and podiatrist," because Pelican Bay State Prison, where he is currently incarcerated, "does not have a podiatrist or orthopedist on-site at its prison," and so in order to see one, Morris "must be driven over 300 miles to a contracted hospital." ER-28. Morris was never transferred. The result of the prison's failure to provide Morris with reasonable accommodations for over three years contributed "to the severe degeneration of his knee and foot." ER-38.

## II. Procedural History

Morris, operating *pro se*, filed suit on May 19, 2019, naming as defendants the State of California, the California Department of Corrections and Rehabilitation (CDCR), California Correctional Health Care Services (CCHCS), CDCR Secretary Ralph Diaz, Pelican Bay Warden James Robertson, Dr. Nancy Adams, Dr. Sue Risenhoover, and Nurse Susan Waddell. He alleged that the defendants had violated the Americans with Disabilities Act (ADA) and demonstrated deliberate indifference to his medical needs in violation of the Eight Amendment.

On November 26, 2019, the district court screened the complaint, allowing the ADA claim to go forward and issuing an order of dismissal on the Eighth Amendment claim with leave to amend. On April 30, 2020, the district court granted the Defendants' motion to dismiss the ADA claims, dismissing those claims with prejudice. ER-8. In the same order, the court granted Morris leave to file an amended complaint, screened the complaint, and dismissed with prejudice the Eighth Amendment claims against all Defendants except Dr. Risenhoover and Dr. Adams. ER-13; ER-14. On May 26, 2021, the district court granted summary judgment to Dr. Risenhoover and Dr. Adams on the remaining Eighth Amendment claims. ER-16.

On Morris's ADA claim, the district court held that, "assuming arguendo" that Morris was disabled, he nonetheless failed to allege an ADA violation because his

requests for "a wheelchair, housing in a facility with a wheelchair ramp, and housing in a prison with an on-side podiatrist and orthopedist" were actually "requests for medical treatment, not requests for the prison's services, programs, or activities, as understood by the ADA." ER-7; ER-8. On the Eighth Amendment claim, the district court held that the State of California, CDCR, and CCHS are immune from suit, because "the Eleventh Amendment bars suits against a state and its agencies." ER-13. The court held that Warden Robertson and Secretary Diaz were not liable because "there is no respondeat superior liability in a § 1983 action." ER-13.[7] Morris timely appealed. ER-43.

## SUMMARY OF THE ARGUMENT

I. The district court erred in holding that Morris's requests, including for a wheelchair and access to a wheelchair ramp, were not disability accommodations but instead were "requests for medical treatment." ER-7. A wheelchair or a wheelchair ramp are not medical treatment, because they would not treat Morris's medical issues. Instead, they would accommodate his limitations, thereby allowing Morris to access the programs, services, or activities of the prison by allowing him to move well enough to safely reach them.

---

[7] Morris does not appeal the district court's order dismissing his Eighth Amendment claims.

II. There is no alternative basis on which to affirm the district court's judgment because Morris alleged the other elements of an ADA claim. (A) Morris plainly met the legal test for a disability, which "is not meant to be a demanding standard." 28 C.F.R. § 35.108(i). Morris was diagnosed with multiple and severe conditions in his foot and knee, including an orthopedic disorder, foot infection, osteoarthritis, a torn meniscus, and an injury to his ACL. Those conditions substantially limited his ability to walk and stand, which are major life activities. (B) Although Morris's *pro se* complaint lacked detail about the specific services his disability prevented him from accessing, it is beyond plausible that he lacked meaningful access to at least one of the prison's programs. A prisoner who cannot walk or struggles to walk lacks meaningful access to programs, services, or activities, including visitation, meals, educational programming, work programs, showers, and virtually every other service a prison offers outside of an individual's cell. Even if this Court were to hold that Morris's failure to identify specific services was fatal to his ADA claim, the appropriate remedy would not be affirmance but instead a reversal and remand for him to amend his complaint. (C) Defendants also acted with "deliberate indifference." Defendants were aware of Morris's knee and foot conditions, his difficulties walking, and his need for accommodations, because CDRC medical staff diagnosed Morris with multiple and severe medical conditions that impeded his ability to walk, and also because Morris told them so. But

Defendants did not grant Morris's request for a wheelchair or transfer to a building with a wheelchair ramp, and failed to provide Morris with any accommodations at all for three years. Morris's allegations are more than sufficient to plead deliberate indifference and state a claim for monetary damages at the motion to dismiss stage.

## STANDARD OF REVIEW

An order granting a motion to dismiss for failure to state a claim is reviewed *de novo*. *See Palm v. L.A. Dep't of Water & Power*, 886 F.3d 1081, 1085 (9th Cir. 2018). In reviewing a motion to dismiss, this Court must take all factual allegations in the complaint as true, and deny the motion to dismiss if the complaint contains sufficient factual allegations to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *Pro se* complaints like Morris's are construed liberally at the motion to dismiss stage and are "held to less stringent standards than formal pleadings drafted by lawyers." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curium)).

## ARGUMENT

I. **A Wheelchair and Housing with a Wheelchair Ramp Are Disability Accommodations, Not Medical Treatment.**

The district court erred in holding that Morris's requests, including for a wheelchair and access to a wheelchair ramp, were not disability accommodations but rather "requests for medical treatment." ER-7. Morris's requests for medical treatment, the court concluded, did not state a claim under the ADA, because medical

treatment is not one of "the prison's services, programs or activities, as understood by the ADA." ER-7.

But medical services provided by a prison plainly within the text of a service, program, or activity "as understood by the ADA." ER-7. Though the ADA does not define the "services, programs, or activities of a public entity," the Rehabilitation Act of 1973 defines a "program or activity" as "*all* of the operations of … a local government." 29 U.S.C. § 794(b)(1)(A) (emphasis added). The Rehabilitation Act and the ADA are generally interpreted in tandem, and Congress has instructed courts not to interpret the ADA to be less protective than the Rehabilitation Act or the regulations issued by Federal agencies pursuant to that title. 42 U.S.C. § 12201(a). The Department of Justice, which is tasked with administering Title II of the ADA and promulgating regulations to implement it, has interpreted Title II to apply to "anything a public entity does." 28 C.F.R. Pt. 35, App. B (Section 35.102 Application), at 687 (2017). Those regulations also recognize that "correctional facilities are unique facilities under Title II," because "[disabled] [i]nmates cannot leave the facilities and must have their needs met by the corrections system." 28 C.F.R. Pt. 35 App. A. According to the plain text of the statute, medical services are services as understood by the ADA.

To reach the opposite conclusion, the district court relied on the Seventh Circuit's opinion in *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996), and this Court's

11

citation to *Madigan* in *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir. 2010), *overruled in part on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). The district court misunderstood these cases. First, though the district court relied on *Madigan* for the proposition that medical treatment is not a "service, program, or activity," *Madigan* provided no analysis of the meaning of "services, programs, or activities" in the context of prisons. Instead, *Madigan* held that the "ADA does not create a remedy for medical malpractice"—and thus created an exception to the ADA based not in the text of the statute, but rather in the court's conjecture that Congress would not want the ADA to apply to prison medical services. *See, e.g., id.* at 248–49 ("Could Congress really have intended..."; "it would be extremely odd to suppose that…"; "We would be exceedingly surprised to discover that Congress had made an end run around these decisions in the Americans with Disabilities Act."). Indeed, the bulk of *Madigan* is dedicated to justifying the holding that the ADA almost certainly does not apply to prisoners at all: although "[t]here is no express exclusion of jails and prisons," the court explained, "[j]udge-made exceptions to laws of general applicability are justified to avoid absurdity." 84 F.3d at 248–49.

*Madigan* was wrong on this point. Two years later, Justice Scalia wrote for a unanimous Supreme Court that the plain language of the ADA determined that the statute applied in full to state prisons. *Pennsylvania Dep't of Corr. v. Yeskey*, 524

U.S. 206, 209 (1998). And the Court explained that prisons, like other public entities, "provide prisoners with 'benefits' of "programs, services, or activities"—including "recreational 'activities,' *medical 'services,'* and educational and vocational 'programs.'" *Id*. at 210 (emphasis added). Dictum in *United States v. Georgia*, another unanimous opinion by Justice Scalia, casts additional doubt on the viability of the holding of *Madigan*: "[I]t is quite plausible that the alleged deliberate refusal of prison officials to accommodate a prisoner's disability-related needs in such fundamentals as mobility, hygiene, *medical care*, and virtually all other prison programs constituted exclusion from participation in or denial of the benefits of the prisons services, programs, or activities." 546 U.S. 151, 157 (2006) (emphasis added) (cleaned up). In summary, *Madigan* created an atextual exception to the ADA for medical malpractice claims against public entities on the assumption that Congress would not have wanted to displace existing the mechanisms for accountability. *Madigan* did not hold—and this Court did not adopt such a ruling in *Simmons*—that prison medical services are not "programs, services, or activities" provided by a public entity.

The policy concerns animating *Madigan*, and this Court's single-sentence adoption of its medical malpractice holding in *Simmons*, do not bear on the present case. Deprivation of a wheelchair or a wheelchair ramp is not medical treatment, poor or otherwise. A wheelchair or a ramp would not *treat* Morris's medical issues;

13

instead, it would *accommodate* his limitations, thereby allowing Morris to access the programs, services, or activities of the prison by allowing him to move well enough to safely reach them.[8]

This Court has correctly rejected this same argument from CDCR twice in the past year. In *Munoz v. California Department of Corrections and Rehabilitation*, the plaintiff was placed on a top bunk despite a history of knee problems. 842 F. App'x 59, 62 (9th Cir. 2021). CDCR argued that such placement was not a disability accommodation but rather medical treatment and therefore excluded from the ADA under *Madigan*. *Id.* This Court rejected CDCR's argument, holding that "Munoz does not argue he was denied adequate treatment for his knee injuries, only that he was denied an accommodation for his disability." *Id.*

In *Barker v. Osemwingie*, a plaintiff sued CDRC after he was injured by two CDRC officials who used a device to transfer him his wheelchair to his toilet. No.

---

[8] Although this Court need not limit *Madigan* to its facts to reverse the district court's error, it should not read it capaciously, as the Supreme Court has made clear that the policy-based invention of statutory exceptions in the style of federal common law is no longer how courts are to interpret statutes. *See, e.g.*, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020) ("Nor is there any such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception. Instead, when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."); *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2073 (2018) ("It is not our function to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have intended.") (internal quotation marks omitted); *Magwood v. Patterson*, 561 U.S. 320, 334 (2010) ("We cannot replace the actual text with speculation as to Congress' intent.").

20-15503, 2021 WL 5564625, at *1 (9th Cir. Nov. 29, 2021). The magistrate judge recommended dismissing his Title II claim because his claim purportedly addressed the adequacy of his medical care, citing to both *Simmons* and *Madigan*. *Barker v. Osemwingie*, No. 2:16-CV-3008, 2017 WL 3454443, at *4 (E.D. Cal. Aug. 11, 2017), *report and recommendation adopted*, No. 2:16-CV-3008, 2017 WL 6512882 (E.D. Cal. Dec. 20, 2017). This Court reversed, holding that "the district court improperly relied on *Simmons*" because "[t]ransferring an inmate from a wheelchair to the toilet is an accommodation to provide access to toileting services, rather than medical treatment for a disability." *Barker*, 2021 WL 5564625, at *1.

The Third Circuit also recently explained the distinction between disability accommodation and medical treatment in the prison context. In *Furgess v. Pennsylvania Department of Corrections*, a prisoner with leg braces brought an ADA claim alleging that he could not safely get in and out of a prison shower. 933 F.3d 285, 288 (3d Cir. 2019). The district court dismissed his claim, citing *Madigan*. *Id.* at 290. The Third Circuit reversed, as "complaints about not being provided an accessible shower are not allegations of medical malpractice or disagreements about medical treatment. They are requests for reasonable accommodations so that inmates with disabilities can take a shower—just like able-bodied inmates." *Id.* at 291. Like Furgess, Morris sought a wheelchair because he wanted to access the prison's

services, just like able-bodied prisoners—not because a wheelchair or ramp would somehow "treat" his medical issues.

Providing a wheelchair to someone who needs it is a paradigmatic disability accommodation. *See, e.g.*, *Dare v. California*, 191 F.3d 1167, 1172 (9th Cir. 1999) (mentioning that the "International Symbol of Access" for people with disabilities is an image of a person in a wheelchair). The Court should not affirm the district court's decision on the grounds that providing a wheelchair is medical treatment and thus outside the scope of the ADA. Such a holding would eviscerate the Supreme Court's holding in *Yeskey* that the ADA applies in prison, as well as this Court's numerous opinions enforcing that guarantee. *See, e.g.*, *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1062 (9th Cir. 2010); *Pierce v. Orange Cnty.*, 526 F.3d 1190, 1214 (9th Cir. 2008).

## II.     Morris Also Alleged the Other Elements of an ADA Claim.

Although unaddressed by the district court, Morris also successfully pleaded the other elements of an ADA claim. He alleged that he was disabled; that he was denied meaningful access to programs, services, or activities; and that Defendants were deliberately indifferent to disability discrimination.

### a) *Definition of disability*

The district court "assume[d] arguendo" that Morris successfully alleged that he was disabled. Opinion at 5. The district court need not have assumed: Morris's

severe knee and foot conditions are textbook disabilities within the meaning of the ADA.

As enacted in 1990, the ADA sets forth three ways to qualify as disabled: (1) having "a physical or mental impairment that substantially limits one or more major life activities of [the] individual"; (2) having a "record of such an impairment"; or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1). Morris alleged that his injuries substantially limited his major life activities, especially walking, satisfying the first prong, known as having an "actual" disability.

Congress has emphasized that the standard for an "actual" disability is a lenient one. In 2008, in response to Supreme Court decisions limiting the scope of the ADA, Congress passed the ADA Amendments Act (ADAAA), which amended the ADA by broadening its definition of disability. Pub. L. No. 110-325, 122 Stat. 3553 (2008); *Toyota Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999). In the "Findings" section of the ADAAA, Congress made explicit that "courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities," and, in particular have "interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress." *Id.* Congress explained, under the "Purposes" section of the Act, that "the question of whether an individual's impairment is a disability under the ADA should

17

not demand extensive analysis." *Id.* The ADAAA also established a rule of construction that the definition of disability "shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A).

The Attorney General's implementing regulations reinforce the breadth of the ADAAA's definition of a qualifying disability: "The definition of 'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 35.108. As for the word "major" in "major life activity," it is not to be "interpreted strictly to create a demanding standard"; rather, whether "an activity is a major life activity is not determined by reference to whether it is of central importance to daily life." 28 C.F.R. § 35.108(c)(2). The regulation also establishes broad rules of construction for the term "substantially limits," which, per the regulation, is not intended to be a "demanding standard" but instead should be interpreted "broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 35.108(d). An impairment constitutes a qualifying disability if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population," and it need not "prevent," or even "significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.*

Under the lenient definition of a disability under the ADAAA, Morris plausibly alleged that he was limited in several major life activities—especially the ability to walk, which was the only way to meaningfully access any of the services outside of his cell without the accommodations he requested. CDCR's own medical staff took x-rays of Morris's left foot in June 2015 and diagnosed him with an "orthopedic disorder." ER-20. In October 2015 and again in February 2017, CDRC physicians evaluated Morris's knee, which he reported was swollen and painful, and ordered him to keep it elevated. ER-20; ER-21. In May 2017, Morris told a CDRC physician that his knee was "preventing him from walking"; she took x-rays of his knee and diagnosed him with "a small effusion, moderate patellofemoral [pain syndrome], and medical compartment osteoarthritis." ER-22. Morris told the same CDRC physician in November 2018 that he was experiencing "chronic knee pains," and showed her the ulcers on his foot which had become "5mm deep at one point." ER-23. The CDRC physician concluded that the infection was so severe as to require surgery, and CDRC referred Morris to a surgeon in December 2018 who agreed that "amputation" may be required. ER-23; ER-24. Also in December 2018, CDRC medical staff took x-rays and an MRI of Morris's knee and expanded his diagnoses to include "arthritis with joint effusion"; "severe degenerative changes within the medial compartment"; "severe contemplation at the pateauofemoral joint"; an "extensive tear of the posterior horn and body of the medial meniscus"; and an

injury to his ACL—all conditions that impair a person's ability to walk. ER-25. In February 2019, CDRC medical staff received additional x-rays and an MRI of Morris's foot, and added to his diagnoses "soft tissue edema and enhancement with cellulitis" at the joints, and "moderate to severe degenerative changes at the talonavicular joints." ER-24. These conditions also make it difficult to walk. Morris was seen by a wound team in February 2019, and CDRC referred him to a podiatrist and an orthopedist. ER-25.

In addition to the allegations of doctors repeatedly finding problems with Morris's foot and knee that substantially limited him in major life activities, including walking, Morris alleged frequent self-reports of knee and foot pain and an inability to walk safely or without pain. ER-20; ER-21; ER-22; ER-23. Furthermore, Morris alleges that he requested a knee brace, cane, wheelchair, and transfer to a building with a wheelchair ramp, which would have provided no benefit to him unless his limitations were genuine. ER-28; ER-35; ER-36; ER-37; ER-38; ER-40.

Morris's allegations easily satisfy both the standard for disability after the ADAAA and the lenient requirements for a *pro se* complainant to allege the elements of his claim. The district court's decision cannot be affirmed on this ground.

b) *Programs, services, and activities*

The district court erred by holding that Morris did not allege that he was denied meaningful access to a program, service, or activity. A prisoner who cannot

walk or struggles to walk and is not provided a meaningful accommodation lacks meaningful access to programs, services, or activities, including visitation, meals, educational programming, work programs, showers, and virtually every other service a prison offers outside of an individual's cell. *See, e.g.*, *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 73 (2d Cir. 2016) (prisoner with a mobility impairment was unable to access the law library, doctor appointments, meals, the bathroom, jobs, and recreation); *Matthews v. Pennsylvania Dep't of Corr.*, 613 Fed. App'x 163,168–69 (3d Cir. 2015) (prisoner with a mobility impairment could not access meals, religious services, recreation, or the telephone); *Golden v. Illinois Dep't of Corr.*, 2016 WL 5373056, at *1 (N.D. Ill. 2016) (prisoner did not have meaningful access to meals, communal exercise, religious services, or showers because of his mobility impairment); *Neal v. Indiana Dep't of Corr.*, 2016 WL 6581005, at *1 (S.D. Ind. 2016) (prisoner who experienced pain and discomfort when walking could not "participate in vocational, educational, and rehabilitative programs"); *Kearney v. New York State Dep't of Corr.*, 2012 WL 5197678, at *1 (W.D.N.Y. 2012) (prisoner with a knee injury could not access programs, services, and activities outside their cell, including "recreation, showers, medical and dental treatment[,] and haircuts"). Although Morris's *pro se* complaint lacked detail about the specific services his disability prevented him from access, it is beyond plausible that he lacked meaningful access to at least one of the prison's programs.

21

Even if this Court were to hold that Morris's failure to identify specific services was fatal to his ADA claim, the appropriate remedy would not be affirmance but instead a reversal and remand for him to amend his complaint. This Court has held that "[*p*]*ro se* complaints are to be construed liberally and 'may be dismissed for failure to state a claim only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Weilburg v. Shapiro*, 488 F.3d 1202, 1205 (9th Cir. 2007) (quoting *Franklin v. Murphy*, 745 F.2d 1121, 1228, 1230 (9th Cir. 1984)) (internal quotations omitted). Courts should only dismiss a *pro se* complaint without leave to amend "if it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Id.* (quoting *Schucker v. Rockwood*, 846 F.2d 1202, 1203–04 (9th Cir. 1988)) (internal quotations omitted).

It is far from "absolutely clear" that Morris would be unable to cure any defect in his complaint by amending it. He has alleged that he struggled to walk, and it is almost tautological that this kind of disability would prevent him from accessing the prison's services, most of which are located outside his cell. This Court should, at the least, reverse and remand for Morris to amend his complaint to identify the programs, services, or activities that he was unable to access.

*c) Deliberate indifference*

As is necessary to state a claim for monetary damages under Title II, Morris also successfully pleaded that Defendants intentionally discriminated against him. This Court has made clear that intentional discrimination in this context does not require that a plaintiff allege that a defendant acted with "discriminatory animus" or engaged in disparate treatment; it is enough that a defendant acted with "deliberate indifference" in failing to accommodate their disabilities. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138-39 (9th Cir. 2001); *see Updike v. Multnomah Cnty.*, 870 F.3d 939, 950–51 (9th Cir. 2017). Morris has adequately pled deliberate indifference for his claims for damages to survive dismissal.

"Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that [] likelihood." *Duvall*, 260 F.3d at 1139. A "plaintiff has satisfied the first element of the deliberate indifference test" once he has "alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation)" and "the public entity is on notice that an accommodation is required." *Id*. To satisfy the second element, the "failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness." *Id*.

Morris alleged that defendants were aware of his knee and foot conditions, his difficulties walking, and his need for accommodations. And these allegations are far

23

from conclusory. First, Morris told CDRC medical staff on at least two occasions that his knee conditions interfered with his ability to walk. ER-20; ER-22. Second, he alerted CDRC generally that he was experiencing knee and foot problems during at least ten medical appointments with CDRC physicians and their contracted medical specialists, as well as by submitting multiple sick call forms between 2015 and 2019. ER-19; ER-20; ER-21; ER-22; ER-23. Third, based on CDRC's own diagnoses of Morris's knee and foot conditions, his need for accommodations was obvious: CDRC diagnosed Morris with an orthopedic disorder in June 2015; tinea pedia, a knee effusion, patellofemoral pain syndrome, and osteoarthritis in May 2017; and a right knee meniscal tear, injured ACL, cellulitis, and degenerated talonavicular joints in February 2019. ER-20; ER-22; ER-25. These conditions all obviously impede a person's ability to walk. Despite these facts, CDRC failed to provide Morris with a wheelchair or provide him access to a wheelchair ramp, as he requested. ER-28; ER-35; ER-36; ER-37; ER-38; ER-40. In fact, CDRC failed to provide Morris with any accommodations at all until December 2018—over three years after he first alerted CDRC to his knee and foot problems. ER-23. These allegations demonstrate both that CDRC employees were aware of Morris's need for accommodations and that they deliberately failed to accommodate his disabilities.

This Court has held that "[a] denial of a request [for an accommodation] without investigation is sufficient to survive summary judgment on the question of

deliberate indifference." *Updike*, 870 F.3d at 954–55 (emphasis added) (explaining that "[a] trier of fact could conclude that the County acted with deliberate indifference in denying direct requests for [a] accommodation" that was "physically available"); *Duvall*, 260 F.3d at 1140–41. Accordingly, Morris's allegations of the repeated failure to provide basic accommodations are more than sufficient to plead deliberate indifference and state a claim for monetary damages at the motion to dismiss stage.

## CONCLUSION

This Court should reverse the district court's dismissal of Morris's ADA claim and remand to the district court for further proceedings.

Date: December 1, 2021

*/s/ Samuel Weiss*
Samuel Weiss

Rights Behind Bars
416 Florida Avenue NW, #26152
Washington, DC 20001
Attorney for Appellant Tairay Morris

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,797 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word with a Times New Roman 14-point font.

Date: December 1, 2021

*/s/ Samuel Weiss*
Samuel Weiss

Rights Behind Bars
416 Florida Avenue NW, #26152
Washington, DC 20001
Attorney for Appellant Tairay Morris

# CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: December 1, 2021

/s/ Samuel Weiss
Samuel Weiss

Rights Behind Bars
416 Florida Avenue NW, #26152
Washington, DC 20001
Attorney for Appellant Tairay Morris